Vares v. McDonald Mr. McCrozza, your number is ready. Thank you, Your Honor. Members of the panel, in this matter, Rappellant Barries is asserting that the Veterans Court continues to misinterpret and misapply 38 U.S.C. section 1154B, the combat veteran's preference. We believe that it's shown on the face of this record with regard to Judge Moorman's decision where he starts out by saying that the court has never held that a condition defined in terms of tone threshold perceptions and speech recognition measurements is susceptible to lay observation. Now translating that into vernacular, he's saying that the Veterans Court does not accept lay testimony that a person has hearing loss. I believe that that is not what this court's jurisprudence allows for, and it's certainly not what Congress intended when it created the combat veteran's preference. Can I ask you a question about, I guess it's sort of particular to the pages, page six of your brief, which is a portion of an extended quote from, I guess, a declaration that Mr. Verri's submitted or some kind of submission by him. In the middle of that page, it was in my assignment, paragraph, reads to me as though that is saying that it wasn't what I experienced in combat. It was rather what I experienced in this rifle training, non-combat duty that is the basis for my appeal. And if that's what it says, how does the 1154B have any bearing on this case? Excellent question. Because the sentence before that starts out with that Mr. Verri's was a combat infantry commander in Korea, where he begins his statement as to the cause of hearing loss by saying that he was in the vicinity of artillery, recoilless rifles, and tanks while in combat. He then goes on, because he's a way person and he- So you think I'm just really over-reading the assertion here about the real hearing problem having been caused by the, was it Kansas, anyway, the rifle training that he did after he returned from Korea, that it's not really limiting it to that. It's a troublesome statement by the veteran, so I don't mean- I don't think, unless I'm misremembering, I don't think that the government or the board or others relied on this, but it was striking to me. They did not, and it's striking to me as well, but the record is what the claimant says. I believe that when you look at the totality of the veteran's statement, he's saying that while I was in service, I was exposed to a lot of loud noises, and here are examples of it.  I was near large tank cannons when they went off. I was in the vicinity of recoilless rifles, and so on. He then goes on to say, and if that wasn't enough, when I came back, I was training guys on recoilless rifles, and I was also exposed to sound, but this record doesn't have the problem of the VA saying that the claimant, the appellant, excuse me, Ms. Ferris, is not entitled to the application of 1154B. They're just not saying that the application of 1154B gets him to death, it only gets him to his auditory trauma. Now, in this court's jurisprudence, there's a lot of different language going back and forth between the issue of auditory trauma, something that would cause a person to lose their hearing, and the conclusion from that, that the person lost hearing. One would assume from reading your jurisprudence and from general experience that that's because everybody that experiences an auditory trauma doesn't necessarily lose their hearing. I took it that there were actually three things that were part of our jurisprudence. One is the event, the auditory trauma, loud, loud noise. The second is injury right then and there that might have been caused by that, in combat, so the in combat injury. Then the third is the injury on the basis of which the current claim of disability is being made. I think it's fair that our cases have said 1154B applies to both of the first two, but not to the connection from the in combat injury suffered as a result of the in combat event to the later injury on the basis of which the claim of disability is made. Nexus, I guess, is often used to describe that, and that's not what 1154B covers. It's a yes and no answer. You don't seem to be entirely consistent with how 1154 is applied, and that's why I'm here. I think that what you've actually said with regard to 1154 is that we normally look at veterans' cases in terms of a three-step sequential analysis of which that third step is where veterans run into the most problem of establishing a nexus between what happens to them in service and the claim for disability under the system. But you've also said that there seems to be a separate and distinct three-step analysis with regard to 1154 claims, which require a different analysis with regard to what one and through their own testimony, the loss of hearing, and then the VA under the shifted burden has to, with clear and convincing evidence, show that this is not correct. And it doesn't seem that the Veterans Court follows that line of cases with regard to hearings because otherwise I wouldn't be here. So we believe that Mr. Veres is capable of establishing through his own late testimony that he was exposed in combat to loud noise, that he was told rather than he observed for that there's nothing else that causes this hearing loss, and therefore he can link his service time in the Korean War to his employment and examination that he talks about in 1960 or the early 1960s where his employer said, you need to get your hearing checked, and they checked his hearing and he had hearing loss. Well, counsel, let me interrupt you. I think there's no question that there's hearing loss, but there's something curious about the record, and I wonder if you can straighten it out. Throughout, it seems that every professional, every audiology professional who was asked for an official opinion said or did not say that the relationship, the nexus, was possible. Instead, consistently said that it would be speculative. Now, that gap between refusing any sort of opinion, including, I gather, one that might say that the relationship is certainly possible based on a lot of undisputed facts, it looked to me as if this was something that the court, the board, the court gave weight, dispositive weight to, that there was no one, no professional who said that it was at least as likely as not more likely than not. Is there a gap in the record here as it was produced that may have, based on what you were just telling us, distorted the result? I don't believe there's a gap in the record in the sense that there's out there in the But it wasn't verified. I mean, this is really the question. The professional said it was speculative, leaving the impression that it was an overreach to suggest the relationship. I don't believe that's the only way one could look at this. This may be because I'm getting older. Anyway, it came out that way. What the record seems to show is that when the hearing professionals were asked contemporaneously to a service within the first 10 years about his hearing loss, they were only asked whether or not he was experiencing hearing loss, which was confirmed that he was, so that the people around him that said that he was not hearing them and that he had a problem were then reinforced and could tell the veteran that he needed to deal with the issue of his hearing loss. Now, that's in the early 1960s. No one asked at that time, because it was not a claim for veterans' benefits, for any causal link. They didn't ask whether people just in their early 30s have severe hearing loss or whether it could be related to being in combat in Korea or anything like that. So what we have is the nexus between the service time and the early in life hearing loss. Then things moved from 1952-ish in Korea to the late early 2000s at various VA facilities for testing. Some 50 years later, after the injury to Mr. Berry's hearing, audiologists say repeatedly in the record, it's an old guy. We can't tell you why he can't hear. If there wasn't the intervening hearing examination in the 1960s, this wouldn't be much of a claim, because when you wait too long, it is quite possible that no one can associate what's happening with you now with something that happened to you 50 years ago. But that's not this record, and that's not what the VA did with this case. So what we can actually see from this record is that 50 years later, no professional person is willing to speculate that there's a relationship between the autistic trauma of combat and the hearing loss of a man who by then was in his 70s. So they're just saying, we'd have to speculate. We can't tell you why he currently has hearing loss because of the intervening time period. We're well into the rebuttal. Sorry. Thank you, Your Honor. May it please the Court. As an initial matter, Mr. Averius did not contest the Board's application of 1154B at the Veterans Court, and the Veterans Court accordingly did not interpret 1154B in its decision. Can I just ask you about 1154B? This may be the longest sentence in record, but 1154B appears at page 12. The sentence goes on forever, and it doesn't get even to a comma until line 7 or 8. So what is the government's position on what this comes into, sort of going back to Judge Toronto's point about the sort of three parts in this analysis, and where the 1154, how 1154 fits in? Well, I would say consistent with this Court's precedent, the government's position is that 1154B lessens the evidentiary burden upon a veteran who is engaged in combat to establish that he has an injury or disease that was incurred in service. It does not establish a current condition or the nexus. That's consistent with this Court's statement in Davidson, where Davidson specifically looked at the nexus question and held that 1154B did not apply to nexus, rejected that challenge, and cited approvingly, quoting the Veterans Court's decision in Calusa v. Brown, quote, 1154B deals with questions of whether a particular disease or injury was incurred or aggravated in service, that is, what happened then, not the question of either current disability or nexus to service. And do you understand the other side's argument as being contrary to that? Do I understand their argument as being? Yes, I do. I think it is focused upon nexus, and assuming that this Court had jurisdiction to hear, assuming that it had been raised by the Veterans Court, which it was not, because we would concede, under 4C, this Court would have jurisdiction over, obviously, disagreements of interpretation of regulation or statute and interpretation by the Veterans Court of a regulation or statute. That's not at issue here, because 1154B isn't even mentioned. But what we do have is... Can I just double-check on something? If they had made the legal argument to the Veterans Court, and the Veterans Court had said nothing about it, but had the Veterans Court accepted it, the result would have been different. We can review that legal question, even though it's completely implicit. Well, you can under 4C if the decision would have been altered by adopting the position urged. And I would say, in this case, it would be altered by adopting the position urged, and that 1154B would apply to that. Because of the fact that the Veterans Court didn't say anything about 1154, it doesn't end the inquiry. One also has to look and see what he argued to the Veterans Court. What he argued to the Veterans Court in order to determine whether or not you have jurisdiction. That's correct. And that's under this Court's en banc opinion in 4C. But presuming, again, aside, assuming that this Court did have jurisdiction, in the first instance, we would note that this Court's precedent would have 1154B not apply to the nexus prong. At argument today, although Jandreau, Buchanan, Davidson are not cited in the petitioner's brief, he argues that this is a question of lay evidence. It's clear looking at the Veterans Court opinion that they were both aware and looking at Jandreau and Davidson and applying the facts of this case to this Court's requirements in Jandreau versus Davidson. But we will note that the exact language in Davidson, it says, we have consistently held that lay evidence can be competent, and it's quoting Jandreau, to establish a diagnosis of a condition when, and the one he seems to focus on, one, a lay person is competent to identify the medical condition. Now, that means, as this Court has said in King, the Veterans Court and the Board can't categorically say, well, it's lay evidence, so it can't count at all. But they have to go to the question, is the lay person competent to identify the medical condition? Certain conditions may not, and there are other, they do need to consider symptoms. There's other things they do need to consider. It's clear the Board considered statements of symptoms and statements of the 1960 diagnosis. All of those were considered by the Board. But in terms of identifying the medical condition, it's important to think of, imagine a condition where a lay person comes in and says, you know, my red blood cell count is under 4,000 million, or under 4 million. And he would not be competent, generally, to provide that information. He would be competent to say, well, I went to a doctor, and the doctor said, my red blood cell count is this. Or he might be competent to give symptoms, which would be consistent with a low red blood cell count, which might ultimately get you to an accessory determination of a requirement to compensation. But it is perfectly reasonable in this case for the Veterans Court to note that they haven't held that tone threshold perceptions, such as that are found at page 55 through 57 of the petitioner's appendix, are not subject, generally, to lay observation. So, unless there are any further questions? Well, I do have, as a matter of procedure, we have, the Court says, and the Board says, that if the evidence is inequitous or unclear, that the doubt always is resolved in favor of the Veteran. So, here we have professionals who don't say either way. They don't say it's more likely than not that there was no causal relationship. They just say it would be speculative either way. So, and the lay evidence perhaps comes in the same category. There's some, the nature of the disability is something which, according to the record, is known to increase with time. So, where is that principle of if you can't decide, if it's inequitous, if it's balanced, if there's evidence on all sides, it's resolved in favor of the Veteran? Well, Your Honor, here they don't find the evidence inequitous. There are several early examinations in which the examiners say it's speculative. But in 2012, we do have an examination in which the examiner, looking at the specific conditions, determines that it is less likely that it is the result of the alleged acoustic trauma. And in that particular case, they focus upon the nature of the hearing loss, it being a sensorineural type of hearing loss, which is basically how the inner eardrum is conveying information to the brain. And they note that that's generally not caused by acoustic trauma. They note the nature of this hearing loss is progressive. And progressive hearing loss, again, would not be normally connected to the type of injury that he alleges. So, we actually do have an opinion here in 2012 that doesn't say, look, I'd only be able to speculate. I'd only be guessing. I agree. That's an opinion going that way. There's also a lot of undisputed evidence about prolonged exposure to very loud noises and so on. On the other side, where is the balance of all of this? And then we have several other professionals who don't take a position that it's unlikely that there's a relationship. Your Honor, one, I think a lot of that goes to the weighing of the evidence. And again, I do think the 2012 report here is critical. The number of medical professionals that don't give an opinion in this particular matter, that don't say it's speculative, if we struck the 2012 opinion, I think whether the evidence was an echo voice might be a viable issue. It might be a good question there about things. But that opinion, when it ultimately was offered, does clearly find, looking at all of the previous medical reports, looking at all of the evidence, clearly finds that it is less likely than not that this is the result of the alleged acoustic trauma, the alleged injury. So I do think that that report is dispositive here and ultimately resolve this case. And it's clear the Board will rely very heavily upon that report. Can I just ask, I know that this is the July 2012 report. Yes, that's correct, Your Honor. And I remember the, what is it, less likely as not phrase from the report. I believe that's the precise language. I don't have it right here on my notes. I'm just looking in the Board opinion, whether the Board quoted that language or specifically found the less likely than not proposition as opposed to... Well, I would have to find the exact page, but I'm very, I'm certain they did. They found the July 2012 medical report highly probative, based upon the review, how to review the documented medical literature, and there are no contrary competent medical opinions of record. At the end, I do believe the Board also does, you know, say the preponderance of the evidence is against entitlement to service connection. So I do think in terms of weighing the evidence, they're not finding this a case where the evidence is equipoised and they need to determine that they rely very heavily upon, you know, the, that particular report. They also note, of course, the lapse in time and a number of other factors. But I, you know, I do think that report is extremely significant in the Board's opinion on how to treat this case and weigh the evidence. Thank you. Thank you, Your Honor. Incredibly briefly, if you review the 2012 report from the audiologist, it is nothing but speculation. The person says, well, this guy had lumps and measles when he was a kid, and that can cause hearing loss, and he had his tonsils out when he was a kid, and that can cause hearing loss. He has all these things in his life that could cause hearing loss, so it's less likely that it was because of his combat exposure to loud noise. It's not a great example of concise medical opinion based on objective testing or anything even vaguely similar to that. Just briefly, because he's listening for a while, there's a great deal of difference between a layperson saying, I looked at my blood work, and this is what's wrong with me, and a layperson saying, when people talk to me, I have to put my hand up to my ear because I can't hear them. In Evidence 101, when we were all in school, they told you laypeople are, in fact, capable of talking about things that are within the experience of everyone. A layperson can testify that the car was going very fast down the road. A veteran, a layperson, can testify that when I take my glasses off, I can't see the panel, but when I put them on, you're back again. A layperson can tell you that people tell me that I can't hear, and I'm a pain to talk to because I don't pick up the information. In terms of your jurisprudence, I think that these versus Schnecke helps Mr. Beres. It doesn't hurt him because it says that the 1154 presumption stays with the veteran. It is not a soap bubble presumption that once you accept that the person can testify to the combat trauma, there's no longer a presumption. It says the presumption sticks with the veteran, including that there is a relationship or nexus, and that's not unusual for this court way back in Collette versus Brown. Final point. That was the final point. I thank you all for your patience and leadership.